UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

CHARLES R. KASTNER                       )
(Social Security No. XXX-XX-4980),       )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )          3:09-cv-186-WGH-RLY
                                         )
MICHAEL J. ASTRUE, Commissioner          )
of Social Security Administration,       )
                                         )
                    Defendant.           )


## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 6,

11) and an Order of Reference entered by Chief Judge Richard L. Young on April

16, 2010 (Docket No. 12).


## I.  Statement of the Case

Plaintiff, Charles R. Kastner, seeks judicial review of the final decision of

the agency, which found him not disabled and, therefore, not entitled to

Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").

42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction

over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on June 22, 2006, alleging disability since

January 7, 2005.  (R. 129-33).  The agency denied Plaintiff's application both

initially and on reconsideration.  (R. 82-85, 89-95).  Plaintiff appeared and

testified at a hearing before Administrative Law Judge Arline Colon ("ALJ") on November 12, 2008. (R. 29-79). Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE"). (R. 29). On December 18, 2008, the ALJ issued her opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the economy. (R. 12-23). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-3). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on December 22, 2009, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Born on August 10, 1960, Plaintiff was 48 years old at the time of the ALJ's decision, with a high school education. (R. 21). His past relevant work experience included a job as a truck driver, which was heavy, semi-skilled work. (R. 21).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

Plaintiff underwent an exam by Steven Rupert, D.O., on January 4, 2005. (R. 203-08). Plaintiff complained of pain in his buttocks, hip, shoulder, lower and upper extremity, and right hand, as well as headaches and cervical pain. It was noted that Plaintiff was right hand dominant. (R. 203). He reported that his headaches occur twice a week and last all day. (R. 204). He also explained that his pain had progressively gotten worse since a fall off of a ladder 16 years

earlier.  One month prior to the visit with Dr. Rupert, Plaintiff reported hearing a pop in his neck after pulling on a refrigerator.  (R. 204).  Plaintiff reported that he gets three to four hours of sleep at night, he awakens 30 times a night, and that he feels unrested upon awakening.  (R. 205).  Plaintiff reported smoking one-and-a-half packs of cigarettes daily for 26 years and that he has not exercised regularly either before or after his injury.  (R. 206).  Plaintiff reported working 60-70 hours a week with no missed work due to pain; he was able to do all activities of daily living but had trouble standing, stooping, and lifting. Senses in his lower extremities were normal.  (R. 206).  Muscle strength in Plaintiff's upper extremities was normal.  Straight leg test on the right did cause right and left side low back pain.  There was no tenderness with palpitation of the lumbar spine; however, Plaintiff's cervical region was tender.  (R. 207).  The diagnosis was lumbalgia and cervicalgia (R. 207), and it was noted that Plaintiff was not a surgical candidate at the time, he might need injections, and he could return to work without restrictions.  (R. 208).  Later on January 4, Dr. Rupert completed a form indicating that Plaintiff could return to work on January 10, 2005, with a limitation to light work with no climbing ladders, no loading/unloading trucks, and no driving.  (R. 197).

On January 5, 2005, Plaintiff underwent an MRI of the lumbar spine.  (R. 200).  The impression was broad based asymmetric disc protrusion to the right at L4-L5, which did not appear to cause significant effacement to the right L4 nerve root.  There was also small broad based disc extrusion centrally at the L5-S1 level, with no significant central canal or nerve root compromise.  (R. 200).

On January 6, 2005, Plaintiff underwent an MRI of the cervical spine, which was compared to a September 2004 MRI. (R. 202). It revealed that at C4-C5 there was stable spondylosis producing moderate foraminal stenosis, coexistent small to moderate sized, broad based central/paracentral soft disc herniation, more so on the right, which combined to result in mild central canal stenosis. At C5-C6, there was a stable combination of spondylosis and moderate sized, broad based central soft disc herniation with bilateral paracentral extension, producing severe central canal stenosis, and bilateral/lateral foraminal stenosis. At C6-C7, there was stable mild spondylosis and small central soft disc herniation.

On January 7, 2005, surgeon Mike Chou, M.D., reviewed Plaintiff's records and his impression was that Plaintiff suffered from a herniated cervical disc causing myeloradiculopathy. (R. 254). Dr. Chou opined that Plaintiff needed a discecotmy at C5-C6 and cautioned that Plaintiff still might have persistent problems with myelopathy after surgery. (R. 254).

On May 27, 2005, James Butler, M.D., examined Plaintiff for complaints of pain in his left arm and neck. (R. 227-28). He was not working for the past five months, and was not exercising. Range of motion in the neck and lower back was limited. (R. 228). The assessment was cervical pain, abnormal MRIs and radicular symptoms on the left side; Dr. Butler noted that he disagreed with Dr. Chou's opinions and opined that Plaintiff could perform sedentary work. (R. 228). Later on May 27, Dr. Butler completed a form entitled Work Status Report

in which he indicated that Plaintiff could return to sedentary work with a restriction of lifting no more than five pounds.  (R. 226).

On June 8, 2005, Dr. Chou re-emphasized his opinion that Plaintiff needed surgery explaining that "[i]t is clearly ridiculous that anyone would think that there is no surgical indication here, particularly since he has myelopathy with MRI evidence of spinal cord changes."  (R. 256).

Plaintiff underwent another MRI of the cervical spine on March 14, 2006. (R. 218).  The exam revealed spondylosis at C4-C5, C5-C6, and C6-C7, much like the exam in January 2005.  Plaintiff also experienced disc herniation at all three of these levels, as well as severe stenosis at C5-C6.  (R. 218).  On March 15, Dr. Chou characterized these results as "pretty bad stenosis at C5-6 due to both the disc and some ligamentum constriction.  He does have degenerated discs above and below that, but the cord is affected only at C5-6 it appears."  (R. 283).

On April 4, 2006, Plaintiff underwent an elective anterior cervical discectomy at C5-C6 performed by Dr. Chou.  (R. 234, 239-40).  Discharge diagnosis was a herniated disc at C5-C6.  (R. 234).  Preoperatively it was noted that Plaintiff suffered from bilateral C6 myeloradiculopathy secondary to herniated disc at C5-C6, with spinal cord compression.  (R. 239).

On April 18, 2006, x-rays of Plaintiff's cervical spine revealed fusion at C5-C6 with excellent alignment; there was some mild narrowing of neural foramina bilaterally at C5-C6, secondary to degenerative spurring.  (R. 249).

On April 19, 2006, Dr. Chou indicated that the surgery had resolved Plaintiff's arm pain, but he began to experience problems with his left shoulder and was unable to lift his left arm; he had left C5 radiculopathy. (R. 259).

On May 1, 2006, after his surgery, Plaintiff underwent another MRI of the cervical spine. (R. 214). Plaintiff was reporting that his left arm ached, was numb, and he could not lift it all of the way up. (R. 215). The MRI revealed mild spondylosis and no recurrent disc herniation at C4-C5. At C5-C6, there was satisfactory anterior fusion, as well as less pronounced central canal stenosis and cord flattening and stable mild central cord edema. Finally, at C6-C7 there was a small to moderate central/left paracentral disc herniation and mild spondylosis. (R. 214).

On May 8, 2006, Donna Lorenzo-Bueltel, M.D., performed an EMG and noted that it revealed mild right median neuropathy at the wrist or carpel tunnel syndrome; there was no EMG evidence of superimposed bilateral cervical radiculopathies. (R. 262).

On May 9, 2006, Dr. Chou noted that Plaintiff was much improved with no dragging of his right leg; he was also able to raise his left arm with much less pain. (R. 263).

On June 13, 2006, Dr. Chou indicated that Plaintiff was doing reasonably well except for a complaint of left shoulder pain. He ordered a nerve root block to determine if there was residual radiculopathy. (R. 264).

On June 15, 2006, Plaintiff underwent an MRI of his left shoulder. (R. 212). It revealed mild acromioclavicular osteoarthropathy with minimal medial

arch encroachment, and diffuse edema of the supraspinatous and infra-spinatous muscles. (R. 212).

On June 22, 2006, Dr. Lorenzo-Bueltel conducted an EMG study. (R. 192). Plaintiff had left upper extremity pain and weakness. The results of the EMG indicated increased insertional activity with positive sharp waves in the left infraspinatus muscles. Dr. Lorenzo-Bueltel opined that Plaintiff suffered from severe chronic active left suprascapular neuropathy. (R. 192).

Notes from Dr. Chou on July 3, 2006, indicated that Plaintiff was feeling less shoulder pain and was walking better than prior to his surgery. Dr. Chou noted that Plaintiff could return to work if he was able to tolerate it, but he could not return to his previous job as that involved heavy lifting. (R. 276).

On August 4, 2006, Plaintiff underwent a consultative exam by Jon M. Hall, M.D. (R. 313-14). Plaintiff complained of nerve damage in his left arm, tremors, and constant neck and back pain. He reported that he cannot lift things with his left arm without a lot of pain. He also reported numbness and weakness in his legs. (R. 313). An exam revealed normal gait and station without assistive devices, including normal speed, sustainability, and stability. He did have positive straight leg testing and had some difficulty tandem walking; he also had normal muscle strength. Dr. Hall opined that Plaintiff would have difficulty standing or walking for two hours in an eight-hour work day. (R. 313). Dr. Hall opined that Plaintiff "can sit, stand, walk, handle objects, hear, see, and speak but it would be difficult for him to lift, carry much of anything; standing or walking would be limited." (R. 314).

On September 6, 2006, Plaintiff saw Dr. Chou, who noted that Plaintiff's pain had tapered off, but he still did have a little pain in his neck and left arm. (R. 330). Dr. Chou sent Plaintiff for a transforaminal nerve root block to determine if Plaintiff's pain was related to radiculopathy or a suprascapular nerve injury. (R. 330).

On September 27, 2006, Dr. Chou met with Plaintiff and discussed the need for a second surgery; he opined that Plaintiff needed a C5, C6, C7 decompressive laminectomy. Plaintiff would also undergo a fusion from C-5 to C-7. (R. 328-29). Dr. Chou opined that this was necessary because of Plaintiff's persistent myelopathy. (R. 328).

On October 27, 2006, Plaintiff underwent a C5-C7 decompressive laminectomy performed by Dr. Chou. (R. 372-73). Plaintiff was suffering from severe chronic active suprascapular neuropathy and persistent myelopathic symptoms. (R. 372). Dr. Chou noted prior to surgery that Plaintiff's gait and station were normal but that he did have signs and symptoms of myelopathy. (R. 373). X-rays taken on October 28 revealed a satisfactory C5-C6 fusion. (R. 379).

On November 28, 2006, Plaintiff was one month post-surgery. (R. 387). His pain was almost completely resolved, he was off of pain medication, and he was no longer dragging his foot.

On January 3, 2007, Plaintiff saw Dr. Chou. (R. 386). Plaintiff was doing reasonably well except for some neuropathic pain around his shoulders and arms involving some hypersensitivity. He started Plaintiff on Lyrica. (R. 386).

On March 20, 2007, Dr. Chou indicated that Plaintiff still had neuropathic pain, and that the Lyrica had not been working. (R. 385). He noted that he had done all he could for Plaintiff and referred him to chronic pain management. (R. 385).

## 2. State Agency Review

On September 7, 2006, state agency physician Andrew T. Reiners, M.D., evaluated Plaintiff's condition. (R. 316-23). Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds. He could also stand/walk for two hours and sit for six hours in an eight-hour work day. He had no limits in his ability to push or pull. (R. 317). He could never climb ladders, ropes, or scaffolds, and he could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl. (R. 318). Dr. Reiners opined that Plaintiff could not do overhead work with his left arm. (R. 319). There were no other limitations listed. Dr. Reiners opined that Plaintiff was only partially credible, and that the RFC in his report more accurately depicted Plaintiff's abilities than did Plaintiff's statements. (R. 321). Fernando Montoya, M.D., affirmed this RFC on November 27, 2006. (R. 382).

## III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes

that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV. Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V. The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through December 31, 2010; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date. (R. 14). The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had two impairments that are classified as severe: disorders of the spine and upper left extremity suprascapular neuropathy. (R. 14). The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible. (R. 16-21). Consequently, the ALJ concluded that Plaintiff retained the RFC for sedentary work with no climbing; he can occasionally balance, stoop, kneel, crouch, or crawl; he must be able to stand and stretch for a minute or two after working for 30 to 45 minutes; he can perform no overhead work with the left upper extremity; he would become off task for a minute or two every 45 minutes to an hour; and he is limited to simple work. (R. 15). The ALJ opined that Plaintiff did not retain the RFC to perform his past work. (R. 21). However, Plaintiff could perform a substantial number of jobs in the regional economy, including 1,500 inspector jobs, 6,700 assembler jobs, and 6,700 stem mounter jobs. (R. 22-23). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 23).

## VI.  Issues

Plaintiff has essentially raised four issues.  The issues are as follows:

1.  Whether the Plaintiff's impairment met a Listing.

2.  Whether the ALJ's RFC finding is supported by substantial evidence.

3.  Whether the ALJ's credibility determination was patently wrong.

4.  Whether reliance on the VE's testimony was proper.

**Issue 1:**     **Whether the Plaintiff's impairment met a Listing.**

Plaintiff first argues that the ALJ erred at step three of the sequential evaluation process by failing to find that Plaintiff's back/neck impairment met Listing 1.04 in 20 C.F.R. Part 404, Subpart P, Appendix 1.  However, the ALJ reasonably concluded that Plaintiff's impairment did not meet or substantially equal that Listing.

Listing 1.04 provides as follows:

1.04  Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

With:

A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);]

or

B.  Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

In order for an individual to be disabled under a particular Listing, his impairment must meet each distinct element within the Listing.  *Rice v. Barnhart,* 384 F.3d 363, 369 (7th Cir. 2004).  And, it is important to remember that, at step three, the burden rests on Plaintiff to demonstrate that he meets the Listing.

Here, there has been no argument that Plaintiff meets Listing 1.04B.  Therefore, our analysis is confined to Listings 1.04A and C.  With regard to Listing 1.04A, there has been no showing by Plaintiff that he meets all of the requirements of this Listing; he has not demonstrated the requisite motor loss accompanied by sensory or reflex loss.  In January 2005, Dr. Rupert found normal muscle strength and senses.  (R. 206-07).  In August 2006 (a year and a half later), Dr. Hall also found normal muscle strength.  (R. 313).  Hence, Plaintiff has not demonstrated all of the requirements of Listing 1.04A.  As for Listing 1.04C, Plaintiff argues that he is unable to ambulate effectively.  Listing 1.00B2b specifically defines the inability to ambulate as follows:

(1) Definition.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate,

sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Again, the onus is on Plaintiff to demonstrate objective medical evidence to support his argument that he meets the Listing. In this case, there is absolutely no objective medical evidence to suggest that Plaintiff has an "extreme limitation of the ability to walk" such that he cannot even walk one block over rough or uneven surfaces. In fact, in January 2005, when Plaintiff alleges his impairment rendered him unable to work, Dr. Rupert returned Plaintiff to work with limited restrictions. (R. 197, 208). In May 2006, after Plaintiff's first surgery, Dr. Chou noted that Plaintiff was no longer dragging his right leg. (R. 263). In July 2006, Dr. Chou indicated that Plaintiff was walking better than prior to his surgery and that he could return to work. (R. 276). And, in August 2006, Dr. Hall indicated that Plaintiff had a normal gait and station with normal speed, stability, and sustainability. (R. 313). Plaintiff has not directed the court to any

medical evidence to contradict these findings.  Therefore, he has failed to satisfy

his burden of demonstrating that he met or substantially equaled all of Listing

1.04C.

**Issue 2:  Whether the ALJ's RFC finding is supported by substantial evidence.**

Plaintiff also argues that the ALJ's assessment of his RFC is not supported

by substantial evidence.  However, the ALJ took into consideration Plaintiff's

impairments and reasonably limited him to sedentary work with many

restrictions.  The ALJ provided that Plaintiff must be able to stand and stretch

for a minute or two after working for 30 to 45 minutes, and he limited Plaintiff to

no overhead work with the left upper extremity to accommodate the pain Plaintiff

was still experiencing in his left shoulder; he also limited Plaintiff to simple

work.[1]  (R. 15).  Plaintiff has failed to meet his burden of providing objective

medical evidence to support a more restricted RFC.  In fact, the objective medical

evidence supports the RFC given by the ALJ.  Two state agency physicians

signed off on an RFC for sedentary work.  (R. 316-23, 382).  Additionally,

Plaintiff was examined by Dr. Rupert in January 2005, when he alleges his

disability began, and he was released to perform light work (a much more

strenuous range of work than the limited sedentary RFC provided by the ALJ).

---

[1]Plaintiff argues that an RFC for simple work has "been rejected by the Seventh Circuit."  (Plaintiff's Brief in Support of Complaint at 17).  However, the Seventh Circuit has actually indicated that an ALJ may not account for a mental impairment that interferes with an individual's memory or concentration by merely limiting the individual to simple work. *See Stewart v. Astrue,* 561 F.3d 679, 684-85 (7th Cir. 2009); *Craft v. Astrue,* 539 F.3d 668, 677-78 (7th Cir. 2008).  In this instance, no mental impairment has been alleged.

(R. 203-08).  Also, Dr. Butler, in May 2005, opined that Plaintiff could perform

sedentary work.  (R. 227-28).  And, in July 2006, after Plaintiff's first surgery,

Dr. Chou released Plaintiff to return to work as long as it did not involve heavy

lifting.  (R. 276).  Plaintiff argues that the opinions releasing him back to work

occurred prior to his surgeries.  However, Plaintiff has provided no objective

medical evidence that would indicate that his condition had worsened since the

second surgery.  In fact, Dr. Chou indicated in visits with Plaintiff after his

second surgery that, from a pain perspective and a physiological perspective

(Plaintiff was no longer dragging his foot), Plaintiff's condition had improved

since his second surgery.  (R. 386-87).  Given all of the objective medical

evidence which supports the ALJ's RFC, the court concludes that the ALJ's

decision was supported by substantial evidence.

**Issue 3:** **Whether the ALJ's credibility determination was patently
wrong.**

Plaintiff also argues that the ALJ conducted a flawed analysis of his

credibility.  An ALJ's credibility determination will not be overturned unless it is

"patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).  However,

here the ALJ's "credibility" decision is not only an analysis of Plaintiff's

credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the

ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner

to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in

when determining an individual's credibility:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ conducted a credibility determination as follows:

The claimant testified that he resides with his wife, three children, and one grandchild in a bi-level home with 15 to 20 stairs. The claimant testified that he climbs the stairs at least twice a day. The claimant testified that he has a driver's license, but his wife drove him to the hearing. When asked about the last time he drove, the claimant testified that he last drove to attend his child's basketball game. The claimant testified that he was able to stay for the entire game, but he alternated sitting and standing. The claimant stated that he drags his right leg but he has not been prescribed a cane. The claimant testified that he does not sleep at night, but he gets some sleep in his recliner. In the morning he testified that he does not eat breakfast and does not eat anything all day until his wife comes home from work in the evening. He testified that he lays in his recliner and is able to sleep about 45 minutes at a time. He

watches television for a couple of hours a day. He testified that he can wash dishes if he uses a stool. He has two dogs, but he does not walk them. He testified that he has friends who visit him once or twice a month. The claimant testified that he does volunteer work at the school and he helps with the assembly line for food. He stated that the work took about one hour. He testified that he has not looked for work but he did visit vocational rehabilitation services. The claimant testified that he takes 10 mg. of Percocet in the evening. He was instructed to take it once a day and he prefers to take it in the evening. He testified that he does not take any other medication. The claimant testified that he does not use any other treatment for pain such as ice, heat, or massage. The claimant testified that he is not able to work because he has neck pain, low back pain, and leg pain. He testified that his pain is at a 7 or 8 on a scale of 0 to 10 with 10 being the most pain. The pain is not reduced with his medication.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*****

In terms of the claimant's alleged impairments, the undersigned finds that the claimant is not fully credible. The claimant testified he only takes one Percocet of 10 mg in the evening and no other medications and has not utilized any other pain relieving modality such as ice, heat, or massage. He testified he did [not] take over-the-counter medication because he did [not] mix drugs. The claimant did have two surgeries but neither precluded all work activity. During the appeal process, the claimant stated his condition had not gotten worse (Ex. 8E, p. 2 and 5E, p. 2). There is minimal treatment documented in the claimant's records. The claimant testified to very little activities of daily living, but this appears to be volitional as the claimant also testified that he did not do very many activities when he was working. The lack of activities on the claimant's part appears to be the continuation of a lifestyle choice, rather than due to enforced limitations placed upon him by his physicians.

Notwithstanding, there appears to be some discrepancies between the claimant's testimony and other data contained in the file. On July 11, 2006, the claimant self reported that he was able to shower, get dressed, make a bed, cook, dust, do laundry, grocery shop, and do yard work at a slower pace. The claimant self reported that he could walk 2 blocks before his legs start to hurt. The claimant reported that he could lift 20 pounds (Ex. 3E, p. 2). Of more significance, is that during the hearing the claimant testified that he was able to drive and attend his son's basketball games. The claimant testified that he was able to stay for the whole game. The undersigned takes notice of the fact that basketball games extend for longer durations of periods than the claimant testified he could endure.

(R. 16, 20). Contrary to Plaintiff's assertions, this was not a "boilerplate" credibility determination. The ALJ conducted a very thorough analysis of the reasoning behind his determination that Plaintiff was not fully credible. The ALJ went through the different factors listed in 20 C.F.R. § 404.1529 and explained how those factors lead to a conclusion that Plaintiff was not credible. He determined that Plaintiff's activities of daily living were not as limited as Plaintiff suggested, but that to the extent they were limited, that was more indicative of a continuation of a lifestyle choice than a response to pain. The ALJ also explained that Plaintiff's use of pain medication, the fact that he had a limited recent treatment history,[2] and the fact that he was not engaged in any alternative treatment modalities, all demonstrated that Plaintiff's pain was not as severe as he suggested. This was a reasonable determination, and the court concludes that it was not patently wrong.

---

[2]The record indicates that Plaintiff was not treated for nearly two years prior to the ALJ's decision in December 2008.

**Issue 4:**     **Whether reliance on the VE's testimony was proper.**

Finally, Plaintiff finds fault in the use of the VE's testimony that he can perform a significant number of jobs in the regional economy. Plaintiff argues that the ALJ could not rely on the testimony of the VE because it was not reliable. The Seventh Circuit has indicated that "the standards by which an expert's reliability is measured may be less stringent at an administrative hearing than under the Federal Rules of Civil Procedure." *McKinnie v. Barnhart,* 368 F.3d 907, 910 (7th Cir. 2004). Still, the testimony of a VE must be reliable. *Id.* Consequently, a VE is entitled to give a bottom-line estimate of the number of jobs available. However, when a claimant challenges the foundational support for the VE's testimony of that estimate, the data and reasoning supporting such an estimate must be "available on demand." *Id.* at 911. The Seventh Circuit has, therefore, explained that an ALJ should not unquestioningly accept the testimony of a VE without first inquiring into the reliability of the VE's opinions. *Id.*

The ALJ in this case clearly informed the VE that he would need to advise the ALJ of any conflicts between his testimony and the Dictionary of Occupational Titles, and the VE acknowledged that requirement. (R. 55). The VE then informed Plaintiff's counsel that he was relying on statistics in the Employment Statistics Quarterly that derives its information from the Bureau of Labor Statistics and is published by U.S. Publishing. (R. 70). There is some confusion later in the record as to the source of the VE's statistics as the Occupational Employment Quarterly is referenced several times by Plaintiff's

counsel during questioning of the VE. (R. 70-72). However, regardless of which publication was used, such use was proper. In *Jackson v. Chater,* the Seventh Circuit essentially concluded that use of the Employment Statistics Quarterly was acceptable. *Jackson v. Chater,* 94 F.3d 274 (7th Cir. 1996). The Seventh Circuit has also recently noted that use of the Occupational Employment Quarterly by a VE is permitted. *See Lawrence v. Astrue,* 337 Fed.Appx. 579, 586 (7th Cir. 2009)*; Liskowitz v. Astrue,* 559 F.3d 736, 744 (7th Cir. 2009). Furthermore, in *Liskowitz,* the Seventh Circuit explained that a VE need not be an expert statistician, and a disability claimant cannot demonstrate that a VE's testimony is unreliable simply by demonstrating that the VE does not know exactly how the statistics were compiled. *Liskowitz,* 559 F.3d at 743. Therefore, Plaintiff's argument that the VE's testimony was not reliable in this case is not persuasive.

## VII. Conclusion

The ALJ reasonably concluded that Plaintiff's impairment did not meet or substantially equal a Listing. Additionally, the ALJ's RFC determination is supported by substantial evidence. The ALJ's credibility determination was not patently wrong. And, the VE's testimony at the administrative hearing was reliable. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 22nd day of November, 2010.

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

-22-

**<u>Electronic copies to</u>:**

Eric Joseph Yocum
eric_yocum@msn.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov